IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | : | CIVIL ACTION |
| COMMISSION | : | |
| | : | |
| v. | : | |
| | : | |
| DONALD ANTHONY WALKER YOUNG | : | |
| a/k/a D. A. WALKER YOUNG, ACORN | : | |
| CAPITAL MANAGEMENT, LLC and | : | |
| ACORN II, L.P. | : | |
| | : | |
| and | : | |
| | : | |
| OAK GROVE PARTNERS, L.P., NEELY | : | |
| YOUNG and W.B. DIXON STROUD, JR. | : | NO. 09-1634 |

## MEMORANDUM

**Padova, J.**                                                         **April 12, 2011**

Plaintiff Securities and Exchange Commission ("SEC") instituted this action against

Defendants Donald Anthony Walker Young, Acorn Capital Management, LLC ("Acorn Capital")

and Acorn II, L.P. ("Acorn II"), alleging that Defendants violated the securities laws by running a

Ponzi scheme, pursuant to which they misappropriated over $23 million in investor assets.  The SEC

has now filed an unopposed Motion for Partial Summary Judgment pursuant to Federal Rule of Civil

Procedure 56(d), seeking to establish liability and obtain injunctive relief against Defendants.[1]  For

the following reasons, we grant the SEC's Motion.

## I.      BACKGROUND

The following facts are undisputed.  In 1999, Young and a colleague formed Acorn Capital

---

[1]The SEC filed its Motion on November 29, 2010, at which time Fed. R. Civ. P. 56(d)(2)
provided for the entry of "interlocutory summary judgment . . . on liability alone."  Current Rule
56(a), effective December 1, 2010, simply provides for the entry of partial summary judgment.  See
Fed. R. Civ. P. 56(a).

and, that same year, Young directed the formation of Acorn Capital, II, L.P. ("ACM II"). (Young's Answer to SEC's First Request for Admission ("Admissions") ¶¶ 1, 10.) Since 2001, Acorn Capital has been registered with the SEC as an investment adviser. (Id. ¶ 9.) At all relevant times, Young has been Acorn Capital's managing member. (Id. ¶ 3.) In that capacity, Young controlled Acorn Capital, and the company acted by and through him. (Id. ¶¶ 6-7.)

In 2001, Young directed the formation of Acorn II. (Id. ¶ 61.) One purpose of both ACM II and Acorn II was to invest in securities and other financial instruments. (Id. ¶¶ 11, 64.) Acorn Capital was the general partner of ACM II, and was also the general partner of and an investment advisor to Acorn II. (Id. ¶¶ 12, 62-63.) Limited partners in ACM II and Acorn II did not have any role in the management or operation of the partnerships or the investment of partnership funds. (Id. ¶¶ 18-20, 76-78.) Young controlled ACM II and Acorn II, including their financial accounts and investment decisions, and both ACM II and Acorn II acted by and through Young. (Id. ¶¶ 13-17, 21-22, 66-69, 82-83.)

Beginning in 1999, ACM II accepted investments from investors in the form of limited partnership interests. (Id. ¶¶ 24-25.) Rather than maintaining investor accounts separately, Young and Acorn Capital pooled all ACM II investments in ACM II's own financial accounts. (Id. ¶¶ 26-27.) In November 1999, if not earlier, Young and Acorn Capital began using investor funds in the ACM II financial accounts for purposes other than those that ACM II investors had authorized. (Aff. of Michael R. Shanahan, a senior manager at Kroll, ("Kroll Aff.") ¶ 4; Gov't Change of Plea Memorandum at 4 ("Young admitted that his misuse of client funds began . . . in 1999."[2]); Admissions ¶¶ 29-30.) Among other things, without the investors' knowledge, Young and Acorn

---

[2]Young also admitted to this fact at his guilty plea hearing. (N.T. 7/20/10, at 43-44.)

Capital transferred investor funds directly or indirectly into personal accounts held in Young's name or jointly with his wife and/or to pay Young's personal expenses. (Admissions ¶¶ 29-38; 41-43; Kroll Aff. ¶ 4.) For example, in January 2001, Young used investor funds in which he had no ownership interest to purchase a residence in Northeast Harbor, Maine for $715,000. (Admissions ¶¶ 145-49.) He also used investor funds to landscape, maintain, and construct an addition to that residence. (Admissions ¶¶ 165-76.) In addition, Young used certain ACM II investor funds to pay other ACM II investors. (Id. ¶¶ 39-40.)

Young and Acorn Capital preserved investor ignorance of their fraud by providing false information to ACM II investors about their investment accounts. (Id. ¶¶ 44-45, 50-53.) Specifically, they created and provided to ACM II investors account statements that reflected false profits and inflated account balances. (Id. ¶¶ 46, 51-52.) As a result, ACM II account statements showed balances that ACM II investors expect to have in their accounts based on their capital contributions and expected returns, without any offset for the amounts that Young and Acorn Capital converted for unauthorized purposes. (Id. ¶ 50.) The tax documents that Young and Acorn Capital provided to investors by U.S. Mail also inaccurately reflected the investors' income from their investments in ACM II. (Id. ¶¶ 54-57.) In total, from the inception of ACM II in November 1999 through the commencement of the instant action, Young illegally diverted over $10,256,594 million of investor funds in ACM II's financial accounts for his personal benefit. (Kroll Aff. ¶ 4.)

Beginning in 2001, investors began investing in Acorn II as limited partners. (Admissions ¶ 71.) In some instances, Young and Acorn Capital directed investors in Acorn II to send their investments to ACM II financial accounts. (Id. ¶ 72.) Like ACM II, Acorn II did not maintain separate accounts for each investor; instead, it pooled all Acorn II investments into either Acorn II's

or ACM II's financial accounts.  (Id. ¶¶ 73-75.)  Nevertheless, Young and Acorn Capital provided to both ACM II and Acorn II investors individual account statements for Acorn II accounts that reflected  false account balances.  (Id. ¶¶ 89-90, 123-26, 129.)

Shortly after creating Acorn II, Young substantially discontinued the operations of ACM II. (Id. ¶ 94.)  He stopped providing ACM II account statements to all but one ACM II investor, and instead created Acorn II account statements for those ACM II investors, reflecting that their ACM II investments were now investments in Acorn II  (Id. ¶¶ 95-98.) Likewise, Young's own books and records reflected ACM II investors as investors in Acorn II.  (Id. ¶ 99.)  However, the money that had been invested in ACM II was not actually transferred to Acorn II accounts.  (Id. ¶ 100.)   Rather, Young used substantially all of the funds remaining in ACM II accounts for his own personal use. (Id. ¶¶ 105-09.)  Thus, the investments reflected in the books and records of Acorn II and ACM II exceeded the assets of the two partnerships.  (Id. ¶¶ 103-04.)

In the end, from the inception of Acorn II on October 22, 2001, through April 17, 2009, Young misappropriated over $13 million of Acorn II's assets for his personal use.  (Id. ¶ 120; Kroll Aff. ¶ 6.)  Among other things, in 2002, he used investor funds from both ACM II and Acorn II to purchase property and construct a family residence in Coatesville, Pennsylvania at a cost of $2.3 million, and he further used Acorn II investor funds in April 2006 to purchase a personal residence in Palm Beach, Florida for $2.1 million.  (Admissions ¶¶ 177-86, 199-205.)  He also used investor funds, without the permission of the investors, to maintain, landscape and improve both the Coatesville and the Florida residences.  (Id. ¶¶ 187-98, 206-14.)

Young accomplished this misappropriation, in part, by instructing Acorn II's accountants to credit investor checks intended for investment in the investor's Acorn II account to an Acorn II

account in Young's name.  (Id. ¶ 111.)  He further accomplished his misappropriation by directing that funds be transferred from Acorn II financial accounts to one or more personal financial accounts in either in his name or jointly with his wife, and instructing Acorn II's accountants to record the transaction as a distribution from an investor's account to that investor.  (Id. ¶¶ 114, 117.)  Young, Acorn Capital and Acorn II then sent account statements to Acorn II investors by U.S. Mail and electronic mail, which reflected false profits and false account balances.  (Id. ¶¶ 123-28.)

In a similar time period, i.e., from the inception of Acorn Capital in November 1999, through April 17, 2009, Young also diverted over $2.5 million in investor funds from Acorn Capital financial accounts for his personal use.  (Kroll Aff. ¶ 7; Admissions ¶ 139.)  Additionally, he directed the disbursement of approximately $9 million from Acorn II financial accounts to Acorn II investors as withdrawals, while directing the accountants to record those distributions as originating from the Acorn II capital accounts of different investors, who had neither requested nor authorized the distributions, and who did not receive the distributions.  (Id. ¶ 122.)

In late 2008, a representative of Cresap, Inc. ("Cresap"), a broker, expressed concerns regarding the Acorn II accounts.  (See id. ¶¶ 243-44, 248.)  In order to hide his conversion of investor funds, Young informed Cresap, in September of 2008, that Acorn II held assets of $27 million in multiple clearing firms when, in fact, Acorn II had but one clearing firm and held assets with an aggregate value of just $6 million or less.  (Id. ¶¶ 238-42.)  In addition, in early 2009, to allay Cresap's concerns and further hide his conversion of investor funds, Young created and provided to Cresap false account statements for Acorn II financial accounts at a bank and a brokerage firm, which reflected approximately $24 million in assets, when, in fact, neither the bank nor the brokerage firm held Acorn II assets.  (Id. ¶¶ 243-50.)

Meanwhile, in early 2009, SEC staff conducted an examination of Acorn Capital. (Decl. of Frank Thomas ("Thomas Decl."), at ¶¶ 8, 59.) In connection with the examination, the SEC sent Acorn Capital, Young and his counsel requests for documents and information concerning the period January 1, 2006 though December 31, 2008. (Id. ¶¶ 9, 60; Admissions ¶¶ 251-53.) According to the SEC, Young and Acorn Capital never provided many of the items requested. (Thomas Decl. ¶¶ 9, 60.) Young admits that he failed to provide certain information and otherwise provided false and inaccurate information to the SEC. (Admissions ¶¶ 254-60.) Young further admits that the reason that he did not provide requested documentation to the SEC was to hide his conversion of investor funds and sustain his fraud. (Id. ¶¶ 261-63.) Ultimately, as a result of his conduct, Young received the direct or indirect benefit of $26,954,356 in ACM II and Acorn II investor funds that he directed to his benefit and/or the benefit of his family. (Kroll Aff. ¶ 9.)

On April 17, 2009, the SEC filed a complaint against Young, Acorn Capital and Acorn II, alleging that Defendants' conduct violated the antifraud provisions of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(1), (2), and (4). The Complaint further alleges that Acorn Capital violated, and Young aided and abetted Acorn Capital's violation of, certain recordkeeping provisions of the Advisers Act. 15 U.S.C. § 80b-4. On April 1, 2010, Young was indicted in a parallel criminal proceeding. See U.S. v. Young, Crim. A. No. 09-110 (E.D. Pa.). He was charged with one count of mail fraud in violation of 18 U.S.C. § 1341, and one count of money laundering in violation of 18 U.S.C. § 1957. On July 20, 2010, Young pled guilty to both counts of the Indictment.

## II.    LEGAL STANDARD

Summary judgment, either full or partial, is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by:  (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute . . . ."  Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

## III.    DISCUSSION

In its Motion for Partial Summary Judgment, the SEC seeks judgment in its favor on the five

Claims for Relief in the Complaint that assert claims against Defendants.[3]  Those Claims for Relief

allege violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b); and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5;

as well as Sections 206 and 204 of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4), 80b-4; and

Rules 204-2 and 206(4)-8 promulgated thereunder, 17 C.F.R §§ 275.204-2, 275.206(4)-8.  The SEC

asks for judgment as to liability only, leaving a determination regarding disgorgement and damages

for a later date.  It also asks for an injunction permanently enjoining Defendants from violating

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and enjoining Acorn Capital

and Young from violating Sections 204 and 206(1)(2), and (4) of the Advisers Act.

### A.      Section 17(a) of the Securities Act, Section10b-5 of the Exchange Act, and Rule 10b-5

The SEC argues that judgment should be entered in its favor on its claims against Defendants

pursuant to Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5.

In combination with one another, Section 17(a), Section 10(b) and Rule 10b-5 prohibit fraud in

connection with the offer, purchase or sale of securities.  Specifically, Section 17(a) provides that:

> It shall be unlawful for any person in the offer or sale of any securities
> . . . by the use of any means or instruments of transportation or
> communication in interstate commerce or by the use of the mails,
> directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of

---

[3]The SEC states, at one point in its brief, that it is "entitled to summary judgment on all counts in its Complaint."  (SEC Br. at 15.)  However, it provides no argument as to the Sixth Claim for Relief, which asserts an unjust enrichment claim against Relief Defendants Oak Grove Partners, L.P., Neely Young, and W. B. Dixon Stroud.  Accordingly, we do not read its motion to seek judgment on that Claim, and address only the First through Fifth Claims for Relief.

a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Meanwhile, Section 10(b) of the Exchange Act provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails . . . (b) [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Finally, the SEC has promulgated Rule 10b-5 pursuant to the rulemaking authority granted to it by Section 10(b). Rule 10b-5 provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The United States Supreme Court has held that the SEC is required to establish scienter in actions under Section 17(a)(1), Section 10(b), and Rule 10b-5, although scienter is not a requirement for an action under Sections 17(a)(2) or 17(a)(3). Aaron v. SEC, 446 U.S. 680, 695, 697 (1980).

Accordingly, based on the statutory language set forth above, to prevail in a civil enforcement action under Section 17(a)(1), Section 10(a) and 10b-5, the SEC must establish that the defendant (1) made false and misleading statements or omissions of material fact, or otherwise employed a device, scheme or artifice to defraud, or engaged in any transaction, practice or course of business which operated as a fraud or deceit; (2) engaged in such fraudulent behavior in connection with the offer, purchase or sale of securities; (3) used the mails or an instrumentality of interstate commerce; and (4) acted with any requisite scienter.

Here, the undisputed record facts establish that Defendants engaged in fraud in connection with the sale of securities. As an initial matter, we note that there is no dispute that limited partnership interests constitute "securities." See SEC v. Holschuh, 694 F.2d 130, 137 (7th Cir. 1982) (citations omitted). Section 2(a)(1) of the Securities Act defines the term "security" to include investment contracts. 15 U.S.C. § 77b(a)(1). An investment contract is "(1) 'an investment of money,' (2) 'in a common enterprise,' (3) 'with profits to come solely from the efforts of others.'" SEC v. Infinity Group Co., 212 F.3d 180, 187 (3d Cir. 2000) (quoting SEC v. W.J. Howey Co., 328 U.S. 293, 301 (1946)). The undisputed evidence clearly establishes that Defendants sold investors limited partnership interests in Acorn II and ACM II, and that the investors were led to expect that those investments would earn profits derived solely from Defendants' efforts. Accordingly, we conclude that the limited partnership interests that Defendants sold were investment contracts and, therefore, securities.

The undisputed evidence also demonstrates that Defendants engaged in fraud "in connection with" the sale of those limited partnership interests. As detailed above, for nearly a decade, Defendants defrauded investors out of millions of dollars by materially misstating information

regarding the use of investor funds, and omitting material information regarding the use of those funds from statements and information given to investors. Information is "material" if a reasonable investor is substantially likely to consider important. See Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988) (citing TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). There can be no question that the omission of information regarding Young's misappropriation of investor funds for personal use was an omission of "material" information. Indeed, there is undisputed evidence that Defendants sent investors account statements for individual investor accounts that did not actually exist and, furthermore, misrepresented the amount of funds actually held on the investors' behalf and what Defendants were doing with the funds that had been invested. This is certainly the type of information that a reasonable investor would consider important.

We also find that the undisputed record evidence demonstrates that Defendants acted with the requisite scienter, i.e., "a mental state embracing intent to manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.2 (1976). The SEC may prove scienter by showing that Defendants did not have "a genuine belief that . . . information [they provided] was accurate and complete in all material respects." In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir. 1989). In this case, scienter is conclusively established by Young's admissions that he provide false information to investors, and that he did so to hide his conversion of their funds. (Admissions ¶¶ 53, 123-26, 133.) It is further proven by Young's admission that he provided false and inaccurate information to the SEC, and that he did so in order to hide his conversion of investor funds and to sustain his fraud. (Id. ¶¶ 254-57, 259, 261-63.) Young's conduct in this regard is imputed to Acorn Capital and Acorn II because he had control over those entities and used them to commit his fraud. SEC v. Haligiannis, 470 F. Supp. 2d 373, 381-82 (S.D.N.Y. 2007) (citations omitted).

The undisputed evidence also establishes that Defendants used the used the mails or an instrumentality of interstate commerce to perpetrate his fraud. By Young's own admission, he provided false account statements to investors in Acorn II and ACM II by electronic mail and by U.S. Mail. (Admissions ¶¶ 126-28.) Also by his own admission, Young provided false tax information to investors in Acorn II and ACM II by U.S. Mail. (Id. ¶¶ 56, 136.)

Accordingly, the undisputed evidence establishes that Defendants engaged in securities fraud as prohibited by Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5. We therefore enter judgment in favor of the SEC and against Defendants Young, Acorn Capital and Acorn II on the claims for violation of these laws, as to liability only.

**B.      Sections 206(1), (2), and (4) of the Advisers Act, and Rule 206(4)-8**

The SEC claims that Young and Acorn Capital violated Section 206(1)(2)( and (4) of the Advisers Act and Rule 206(4)-8, which prohibit investment advisers from engaging in securities fraud. Specifically, Section 206 of the Advisers Act provides that:

> It shall be unlawful for any investment adviser, by use of the mails, or any means or instrumentality of interstate commerce, directly or indirectly –
>
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; [or]
>
>                    *      *      *
>
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

15 U.S.C. §§ 80b-6. Under Rule 206(4)-8, any investment adviser "to a pooled investment vehicle"

violates Section 206-4 by making "any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle . . . ." 17 C.F.R. § 275.206(4)-8(a)(1). An adviser also violates Section 206(4), if he "[o]therwise engage[s] in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle." 17 C.F.R. § 275.206(4)-8(a)(2). Although scienter is required in connection with Section 206(1), it is not required in connection with Sections 206(2) or 206(4). Steadman v. SEC, 603 F.2d 1126, 1134 (5th Cir. 1979); SEC v. Steadman, 967 F.2d 636, 647 (D.C. Cir. 1992).

An "[i]nvestment advisor" under the Act is "any person who, for compensation, engages in the business of advising others . . . as to the value securities, or as to the advisability of investing in, purchasing, or selling securities . . . ." 15 U.S.C. § 80b-2(11). Here, the record definitively demonstrates that Acorn Capital has been an investment adviser registered with the SEC since 2001, and was the investment advisor to Acorn II, which was a pooled investment vehicle.[4] (Admissions ¶¶ 9, 63; Thomas Decl. ¶ 4.) Moreover, from October 22, 2001 through April 17, 2009, Acorn Capital received from Acorn II at least $5,794,236 as payment for its investment advisory services. (Kroll Aff. ¶ 11.) The record also shows that Young was the President, Chief Investment Advisor, Chief Compliance Officer, and Managing Member of Acorn Capital, and that, in this capacity, he

---

[4] A pooled investment vehicles is "any investment company as defined in section 3(a) of the Investment Company Act . . . ." 17 C.F.R. § 275.206(4)-8(b). Under the Investment Company Act, a "investment company" is one which "is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities . . . ." 15 U.S.C. § 80a-3. Acorn II was therefore a pooled investment vehicle. (See Admissions ¶ 64 (stating that the purpose of Acorn II was to invest in securities and other financial instruments).)

-13-

made investment decisions for Acorn Capital's clients.  (Thomas Decl. ¶¶ 4, 13.)  Young was individually compensated for his services insofar as substantially all of his income, from December 1999 through April 17, 2010, was derived from ACM II, Acorn Capital and Acorn II.  (Statement of Uncontested Facts ¶ 5); see also United States. v. Ogale, 378 F. App'x 959, 960-61 (11th Cir. 2010) (stating that ill-gotten gains qualify as compensation under the Advisers Act).  Accordingly, we find that both Acorn Capital and Young were investment advisers as the Advisers Act defines that term.        "Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation." Haligiannis 470 F. Supp. 2d at 383 (citing SEC v. Berger, 244 F. Supp. 2d 180, 188-89 (S.D.N.Y.2001)); SEC v. Blavin, 557 F. Supp. 1304, 1315 (E.D. Mich.1983) ("Once it is found that [defendant] is an investment adviser, which he was under the [Advisers] Act, all of the previous analysis establishing liability under 10(b) applies [to establish liability under the Advisers Act]"), aff'd, 760 F.2d 706 (6th Cir. 1985).  Accordingly, because we have found that the undisputed facts establish the use of interstate commerce to engage in fraud under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, we find that the same facts, in conjunction with Young's and Acorn Capital's status as investment advisers, establish fraud under Section 206(1), (2) and (4) of the Advisers Act.  We therefore enter judgment on liability only in favor of the SEC and against Young and Acorn Capital on the SEC's  claims under Section 206 of the Advisers Act and Rule 206(4)-8.

### C.        Section 204 of the Advisers Act, and Rule 204-2

The SEC asks that judgment be entered in its favor on its claims that Acorn Capital violated, and Young aided and abetted Acorn Capital's violation of, Section 204 of the Advisers Act and Rule 204-2, which are the recordkeeping provisions of the Advisers Act.  Section 204 requires investment

advisers who utilize interstate commerce in their business to "make and keep for prescribed periods" certain records, "furnish such copies thereof, and make and disseminate such reports as the [SEC], by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 80b-4(a). Furthermore, Section 204 provides that the records are subject to the examination by the SEC "at any time." Id. Rule 204-2 adds that investment advisers "shall make and keep true, accurate and current . . . books and records relating to its investment advisory business," including records of cash receipts and disbursements; check books, bank statements, cancelled checks and cash reconciliations; general and auxiliary ledgers reflecting assets, liabilities, capital, income and expenses; copies of orders for the purchase or sale of any security and certain information regarding the transaction; bank statements, cancelled checks and cash reconciliations; financial statements and internal audit working papers; and written communications relating to recommendations made or advice given, the "receipt, disbursement or delivery of funds or securities," or the placing or execution of an order to purchase or sell a security. 17 C.F.R § 275.204-2(a).

In this case, the SEC requested from Acorn Capital in connection with its 2009 examination certain documents and information, including email files, documents reflecting investments in, and disbursements from, Acorn II accounts, Acorn II investor account balances, and the names of Acorn investors. (Admissions ¶¶ 252-53, 256-60.) Young admits that he failed to produce written correspondence in the form of emails or the names of Acorn II investors. (Id. ¶¶ 258, 260; see also Thomas Aff. ¶¶ 9, 60.) Moreover, he admits that the documents he did produce were false and inaccurate. (Admissions ¶ 252 (quarterly performance reports were false and inaccurate), ¶ 256 (cash receipts were false and inaccurate), ¶ 257 (disbursement journals were false and inaccurate), ¶ 259

(account balances were false and inaccurate).)

Under these circumstances, the undisputed record evidence establishes that Acorn Capital, as aided and abetted by Young, did not maintain true and accurate records as the Advisers Act requires, and did not comply with its obligation to produce copies of true and complete records to the SEC upon demand. Accordingly, we enter judgment in favor of the SEC on its claims against Acorn Capital and Young for violation of, and/or aiding and abetting the violation of, the Advisers Act's recordkeeping provisions in Section 204 and Rule 204-2 thereunder, as to liability only.

### D. Permanent Injunction

The SEC also asks that we permanently enjoin Defendants from further violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, and that we permanently enjoin Acorn Capital and Young from violating Sections 204 and 206(1), (2) and (4) of the Advisers Act, as well as Rules 204-2 and 206(4)-8.

Pursuant to Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act, the SEC may bring an action to enjoin "any acts or practices which constitute or will constitute a violation of [the securities laws]," and the court shall issue a temporary or permanent injunction "upon a proper showing." 15 U.S.C. §§ 77t(b), § 78u(d). In determining if an injunction should issue, the court is to determine "whether there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct." SEC v. Bonastia, 614 F.2d 908, 912 (3d Cir. 1980) (citations omitted). We consider, among other things, "the degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood, because of defendant's professional occupation, that future violations might occur."

Id. (citing SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1048 (2d Cir. 1976)).

Considering these factors, we conclude that an injunction is appropriate and necessary in this case. As detailed above, Defendants engaged in a decade-long Ponzi scheme, deceiving a host of investors over a ten-year period, and securing for Young's own personal use over $23 million in ill-gotten gains. Over that time period, Young lived an extravagant lifestyle (with three houses in three different locales), holding out himself and his companies as successful and trustworthy investment professionals, while creating false documentation to convince unknowing investors of the same.[5] Young has now accepted responsibility for his misdeeds, insofar as he pled guilty to his related criminal charges and does not oppose this summary judgment motion, but he did not accept any responsibility for his fraudulent conduct until after the SEC filed a complaint against him. Indeed, as noted above, Young and Acorn Capital intentionally deceived the SEC during its examination of Acorn II by providing the examiners with false and inaccurate information in response to its inquiries. In sum, given the longevity of the fraud at issue, Young's high level of scienter and outright deception of the SEC when it first questioned his and his companies' conduct, and Defendants' failure to respond to the SEC's motion, we conclude that there is a substantial likelihood that Defendants will engage in future violations of the securities laws if not enjoined. Accordingly, we grant the requested injunctive relief and enjoin Defendants from future violations of the securities laws, as requested in the SEC's Motion.

## IV.  CONCLUSION

In sum, we grant the SEC's Motion for Partial Summary Judgment in its entirety, find

---

[5]To impress investors, Young and the Acorn entities also made gifts and donations to various entities, using investor funds. (See Admissions ¶¶ 219-32.)

Defendants liable for the claims set forth in the first five Claims for Relief in the Complaint, and

enter the requested injunctive relief.   An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.